*NOT FOR PUBLICATION*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____
                                            :
**EDWARD F. BALS**,                         :
                                            :
          Plaintiff,                        :
                                            :
                                            :       Civ. Action No.: 14-6055 (FLW)(DEA)
v.                                          :
                                            :              **OPINION**
                                            :
**TRUMP NATIONAL GOLF CLUB**                :
**COLTS NECK LLC, JOE DOES 1-10**           :
**AND ABC CORP 1-10**                       :
                                            :
          Defendants.                       :
_____     :


**WOLFSON, United States District Judge:**

      Plaintiff Edward F. Bals ("Plaintiff") began his employment with defendant Trump

National Golf Club Colts Neck LLC ("Defendant" or "Trump National") as a seasonal, full-time

Locker Room Manager in March 2008, at the age of 74.  In total, Plaintiff worked four seasons for

Defendant, and was not rehired for the 2013 season.  On September 29, 2014, Plaintiff commenced

this lawsuit against Defendant for violations of the Age Discrimination in Employment Act (the

"ADEA"), 29 U.S.C. § 623, and the New Jersey Law Against Discrimination (the "NJLAD"),

N.J.S.A. 10:5-1, et seq.  Presently before the Court is Defendant's motion for summary judgment,

pursuant to Federal Rule of Civil Procedure 56(c), to dismiss those claims.  For the reasons set

forth below, Defendant's motion for summary judgment is **GRANTED**.

## I.      FACTUAL BACKGROUND AND PROCEDURAL HISTORY[1]

---

[1] Plaintiff denies the vast majority of Defendant's statements of undisputed material facts, but a
significant number of those denials consist of unsupported statements or distortions of the record.

Beginning in 2008, Plaintiff was employed as a full-time, seasonal Locker Room Manager at Trump National, which is a golf club located in Colts Neck, New Jersey.[2]  Bals Dep. at 85:14-24.  Plaintiff started working for Defendant at the age of 74.  Id. at 73:4-24.  According to Plaintiff, each season typically lasted from March through November.  Id. 40:20-41:15.  And, at the end of each season, Defendant would terminate Plaintiff, and then he would reapply for the position the following season.  Id.  In the spring of 2013, however, Defendant made the decision not to rehire Plaintiff, who was 79 years old at that time.[3]  Id. at 73:13-75:13.  Plaintiff worked a total of four

---

For example, Plaintiff denies the following: "Plaintiff admits his supervisor, Brian Bauer, was critical of his performance.  Bals Dep. at 94:8-13."  In response, Plaintiff states: "Mr. Bals disagrees.  The cited record is devoid of any evidence supporting this assertion.  This is another classic example of how the defendant is misconstruing the record in this motion."  The referenced portion of Plaintiff's testimony is as follows:

> COUNSEL: Was Brian Bauer ever critical of your performance?
>
> BALS: He got critical one time.  Said I didn't leave enough lockers open, but of course he didn't know the reason why.  Like I said, I got along with everybody.

Bals Dep. at 94:8-13.  From that exchange, it is clear that Plaintiff admitted that Brian Bauer ("Bauer"), his former supervisor, was critical of his performance "one time."  Id.  Moreover, Plaintiff frequently does not cite to the record when disputing Defendant's statements of undisputed material facts, as required by the Federal Rules of Civil Procedure.  See Doebler's Pa. Hybrid, Inc. v. Doebler, 442 F.3d 812, 820 n.8 (3d Cir. 2006) (stating that "[j]udges are not like pigs, hunting for truffles buried in the record.") (internal quotation marks and citations omitted).

[2] Plaintiff was originally hired by Shadow Island Golf Club in 2005, but Defendant subsequently purchased Shadow Island in 2008.  After the purchase, Defendant rehired Plaintiff in 2008.  Bals Dep. at 55:16-56:6, 72:10-17.

[3] As discussed infra, Heidi Brzyski ("Brzyski") was the General Manager at Trump National, and she was ultimately responsible for the decision not to rehire Plaintiff in March 2013.  Ursino Dep. 141:1-20.  However, she made that decision in consultation with Anthony Ursino ("Ursino"), the Director of Golf at Trump National.  Brzyski Dep. at 50:1-52:9.

seasons for Defendant.  Id.  At the beginning of each season, Plaintiff received a yearly raise, and he also received a $500 bonus at the end of the 2012 season. Id. at 177:16-25.

At his deposition, Ursino, the Director of Golf at Trump National, described the job responsibilities of the Locker Room Manager, which include "basically cleaning towels, keeping the area tidy, cleaning shoes, re-spiking shoes, ordering supplies, making sure that the sinks are clean, [and] supplies don't get too low, assigning new lockers, giving guest temporary, temporary lockers, and updating me on whether or not members have moved to a different locker."  Ursino Dep. at 42:5-11.  During his tenure as Locker Room Manager, Plaintiff testified that he experienced age discrimination while discharging his duties.  In particular, Plaintiff testified that "[a] lot of people" called him "old man," including Richard Reynolds ("Reynolds"), a fellow employee at Trump National, as well as Ursino.[4]  Bals Dep. at 27:7-29:1.  Although Plaintiff testified that Reynolds was joking, he stated, "I don't know if [Ursino] was kidding around."  Id. at 28:5-7. Plaintiff later explained:

> BALS:  I asked [Ursino] something.  He came in to me and he said, listen, old man, can you spare a guy for a few minutes?  I says, I don't know.  I'll probably fall down and hurt myself, but sure.
>
> COUSNEL:  So he was joking around?
>
> BALS:  Yeah.
>
> COUSNEL:  All right. Would you take a look at -- did you and Mr. Ursino joke around April back and forth?
>
> BALS:  I don't know if he joked, but I joked a lot. I thought he was joking, too, but obviously, he wasn't.

---

[4] Plaintiff does not state on which date(s) Ursino called Plaintiff an "old man," nor does he state the frequency with which Ursino made such comment(s).  However, Plaintiff points to at least one occasion, on October 21, 2011, when Ursino called Plaintiff an "old man."  Bals Dep. at 153:21-25.

Id. at 154:2-13.  Indeed, Plaintiff described himself as "a bit of a kidder myself."  Id. at 28:23-25.

In addition, Plaintiff testified that Ursino commented to him, "Can you get upstairs all right

today?"  Id. at 28:9-11.

Furthermore, when asked whether someone else had made discriminatory remarks about

his age, Plaintiff testified that Carolyn Gleason ("Gleason"), former Executive Secretary to the

General Manager,[5] made several comments in connection with Plaintiff purchasing eye drops for

the locker room:

> BALS:  Well, it was more of an attitude, like, for example, I was ordering -- I did
> the ordering for the amenities for the men's room, which is standard operating
> procedure.  I was there one day, and Paul Ecker, who was from Ecker Brothers,
> who I did my ordering through, and I was ordering eyedrops for the pollen.  It was
> that time of year, and Ms. Gleason, who was an employee, came in and said, "What
> are you ordering them for?"  She took them out of my hand and walked outside in
> the front where I was and said to J.R., "He's ordering eyedrops.  He doesn't know
> what he's doing."  She came in and said, "You can't order them.  J.R. said so."
>
> COUSNEL:  That was the extent of the conversation?
>
> BALS:  Yeah, but it wasn't a nice conversation.  I mean --

Id. at 29:20-30:10.  In a separate incident, Plaintiff also testified that Gleason made "a couple other

sly remarks," which he believes are indicative of age discrimination.  Id. at 30:21-31:5.  Plaintiff

stated that he and Gleason had a disagreement over his desire to count the towels that were

delivered to the golf club, and that Gleason was upset that Plaintiff would not let other employees

take those towels before he completed his inspection.  Id. at 31:7-33:11.  Plaintiff explained that

"I want[ed] to do a count of them because I [felt that] Mr. Trump [was] getting ripped off."  Id. at

32:18-19.  Plaintiff then stated that "Mr. Trump always wanted a good bath towel and [the towel

---

[5] At the time of this incident, John Roberts ("Roberts"), also referred to as "J.R.," was the General
Manager at Trump National.  Bals Dep. at 30:11-20.  Brzyski succeeded Roberts as General
Manager in 2012.

delivery company] ripped him off in terms of the quality [of towel] they were giving him." <u>Id.</u> at

33:3-5.  At some point, Gleason confronted Plaintiff, and Plaintiff testified:

> BALS:  Carol Gleason.  Like, what are you doing this for?  You can't do this.  I was
> responsible for them, and I'll say this on her behalf.  I'm sure she didn't have a clue
> that money was being stolen.  It wasn't her department, first of all, really, but
> anyway and she made a big thing over it, over a nonissue, really, and we did
> straighten it out.  We got a system.  There was never a problem after that.

<u>Id.</u> at 33:18-25.  After the disagreement with Gleason, however, Bauer, Plaintiff's former

supervisor, had a conversation with Plaintiff about the towel incident.  Plaintiff explained that

"Brian and I spoke, and it was settled." <u>Id.</u> at 110:24-111:1.  He added that "[i]t was no big deal."

<u>Id.</u> at 111:7.

Plaintiff also testified that other employees at Trump National "would bring creamers down

in silver containers and they would be putrid.  It would be moldy." <u>Id.</u> at 36:2-3.  Plaintiff testified

that, beginning in 2011, he would place a sign on the rancid creamers, which stated, "These are

putrid, it stinks, it's foul." <u>Id.</u> at 36:16-19.  He continued, "This went on for 15 weeks… and I

couldn't understand why, that by me putting these signs on these, that I was doing something

wrong." <u>Id.</u> at 37:4-7.  Eventually, Plaintiff was summoned to a meeting with Roberts, the former

General Manager, Gleason and Bauer. <u>Id.</u> at 37:18-40:2.  Plaintiff stated that, at the meeting, those

individuals had pictures of the creamers, "which I saw for the first time with signs I put on it, and

it's like, you're wrong.  I wasn't wrong.  I called to the attention that something was wrong with

their services." <u>Id.</u> at 37:20-24.  With respect to that incident, Ursino testified that Plaintiff

appeared to be "agitated" over his disagreement with Gleason.  Ursino Dep. at 73:19-74:7.

Ursino also explained that he had confrontations with Plaintiff on several occasions.  For

instance, he requested that Plaintiff put nameplates on the lockers for an upcoming golfing event,

but Plaintiff refused because "[h]e said it was an irrelevant outing and he said that the players were

trunk slammers," <u>i.e.</u>, "people who typically play public golf." <u>Id.</u> at 49:13-50:19.  After that

incident, Ursino testified that he had a disagreement with Plaintiff "about, you know, the way he spoke, spoke to me in front of a member." Id. at 71:24-72:1.  In particular, Ursino stated that, "instead of communicating to me what it was he was feeling, he basically started yelling and raising his voice and talking down to me.  And, you know, I asked him afterwards to, if we could have conversations without members present that would be more professional." Id. at 72:19-24.

In addition, Ursino testified that Plaintiff "was selective about who he gave members – gave lockers to and who he didn't give lockers to." Id. at 62:18-20.  Ursino continued, "That was a frequent issue that I had with Ed and he – if he – if the guest was a guest of a member that he felt was going to tip him he would give them the locker." Id. at 62:22-63:3.  However, "if it was a guest of a member that he didn't feel was going to tip him he wouldn't give them a locker and he would frankly pay no attention to them." Id.  As a result, Ursino stated that they "had a disagreement on the fact that I believed every person coming to the club, whether they were a member or guest, should get the same service," but Plaintiff "would tell me that, he would tell me flat out that he wasn't giving lockers to people that he felt were trunk slammers or weren't going to tip him." Id. at 71:13-20.  While Plaintiff denies engaging in such behaviors, he did state that it would be inappropriate for an employee to alter the manner in which he or she treats a member or a guest based on their tipping practices.  Bals Dep. at 191:12-18.

Nevertheless, Plaintiff admitted that Bauer, his former supervisor, "got critical [of his performance] one time" because Plaintiff "didn't leave enough lockers open, but of course [Bauer] didn't know the reason why." Id. at 94:8-13.  In addition, Plaintiff also admitted that Ursino "was critical [of his performance], but I think he was all wrong. There was [sic] two sides to every story." Id. at 94:14-17.  In a separate incident, Plaintiff testified that he would remove locks from the lockers at Trump National, and he would bring those locks to specialist locksmith, which

"became sort of expensive." Id. at 97:5-23. It appears that Plaintiff was not authorized to engage in such activities. See id. However, Plaintiff concluded that he "saved them a whole lot of money because I know how to take the lock off the locker," and as a result, a locksmith was not required to come to the golf course. Id.

Relying on their personal experiences with Plaintiff and his personnel file, Brzyski and Ursino made the decision not to rehire Plaintiff for the 2013 season. Brzyski Dep. at 50:1-9. While the two individuals discussed the decision, Ursino stated that "[t]he general manager has the final call." Ursino Dep. at 141:17-20. Brzyski testified that Plaintiff was not rehired for the following reasons:

> Due to the performance, the attitude about the club, being a team player, and just the type of employee we want in that location. Many – you know, when you're bringing around prospects for membership, that is one of the main people that they see and you want that person to, you know, really be a team player and not be, you know, in a bad way when you're near them….

Brzyski Dep. at 51:20-52:1; see Def.'s Response to Interrogatory No. 6 ("Plaintiff was terminated for poor job performance, including, but not limited to, arguing with guests and fellow employees, placing/taking bets, displaying a preference for certain members over others based upon the tips or other gratuities he would receive from them, and leaving the premises to gamble."). Indeed, Brzyski testified that she was primarily concerned with Plaintiff's poor "interaction with the co-workers. You know, you have to have a cohesive staff in order to run a successful business." Brzyski Dep. at 105:6-11.

Approximately two weeks before the season started, Ursino called Plaintiff to inform him that Defendant would not rehire Plaintiff for the 2013 season. Bals Dep. at 169:23-25. According to Plaintiff, "I was called on the phone by Anthony Ursino…. He said, we're not taking you back this year. I said, Anthony, why? And I guess he startled me, and he says, because you don't get along with people." Id. at 169:1-7. Plaintiff continued:

> BALS:  I said who don't I get along with?  He says, Brian Metzler.  Sir, Brian Metzler and I were the best of friends.  He was head of maintenance, and I said, okay, well, that's shocking to me, and he says, the reason I called you is because they didn't want to, and I'll quote verbatim, because they didn't want to tell you the day before the club opened.  The reason I called is you because they weren't going to let you know the day before the club -- and he said, I didn't think that was any way to treat you.
>
> COUNSEL:  And did you say anything to Anthony at that time?
>
> BALS:  No, that was it.

Id. at 169:9-18.   At his deposition, Plaintiff testified that he "was disappointed, greatly disappointed because when you -- nobody ever said I did anything wrong.  I'll say this honestly. I'd challenge anybody.  Get one member or one guest or a member's kid.  I got along with everybody wonderful.  I challenge anybody."  Id. at 185:6-11.   Moreover, after Defendant's decision not to rehire Plaintiff, Plaintiff sent an undated letter to Brzyski expressing his "outrage" at her decision.  See Pl.'s Letter to Brzyski at pgs. 1-2.  In that letter, Plaintiff stated that he had always been a good employee, and he believed that the whole situation "was handled in the most unprofessional way possible."  Id. at pg. 1.  Indeed, Plaintiff expressed that Defendant's actions were "consistent with a lack of maturity and management experience."  Id.  Finally, Plaintiff advised, "I prefer to settle this amicably; it is not my desire to take any further action.  You may do this simply by contacting me for a meeting and/or in writing to explain your actions."  Id.

Defendant initially filled that position with Michael Kraft ("Kraft"), who was in his fifties in 2013.  Ursino Dep. at 99:17-23; see Kraft Dep. at 11:21-23 (stating that he was born on "8/19/58"); Bals Dep. at 186:18-20 ("I think – see, Mike Kraft was the fella that replaced me, and Michael is in his early 50s").   In choosing a replacement, Ursino testified:

> … Mike wanted to be the caddy master and I told him that, you know, I didn't know when, but I would try to get him into that position because I thought he would be good at it, but [the former Caddy Master] was there doing his job and I had heard that [he] was thinking about retiring and, you know, Mike, Mike and I were aware of that.  So we said, you know what, when the day comes, he decides to retire that

> it was possible that I would put him into that position. So, Mike knew that ultimately that was, you know, that was the goal for him to be the caddy master.

Ursino Dep. at 101:5-16. Ursino explained to Kraft that "I needed help there temporarily, because I just had – basically, I needed help there temporarily to figure out what I was going to do because it was the first season, my first season as Director of Golf." Id. at 99:17-23.

Likewise, Kraft testified that, when he heard that the Locker Room Manager position was available, he asked Ursino "if I could go in there biding my time till the other position came open." Kraft Dep. at 15:9-16, 19:18-21. When the Caddy Master resigned on the first day of the 2013 season, Kraft immediately moved into that position. Id. at 14:1-14, 41:9-16; Bals Dep. at 98:7-16 ("What happened was, Michael Kraft was going to take my place. The very day that the club opened, [the former Caddy Master] quits, so Mike Kraft moved out to be caddy master, which is a job he always wanted"). Kraft testified that he was only Locker Room Manager for approximately "two hours." Kraft Dep. at 16:20-23. Indeed, Plaintiff confirmed that Kraft was only the Locker Room Manager "[o]vernight," and that Curry "is still there, so it's a permanent position, I would assume." Bals Dep. at 98:17-99:4.

With respect to Curry's age, Plaintiff testified, "I don't think Mike Curry – I don't think he's 74. I don't know. I have no idea." Id. at 186:21-25. However, in his responses to interrogatories, dated December 23, 2015, he stated: "Plaintiff 81 years old was terminated without cause and replaced by a 74 year old." Pl.'s Responses to Interrogatories Nos. 17, 18, 19. Similarly, Defendant's responses to written discovery indicate that Curry was in his seventies when he became Locker Room Manager. See Def.'s Response to Interrogatory No. 19 ("Mr. Curry is now approximately 74."); id. at No. 9 (Curry was born on January 29, 1941, and he was 72 years old in March 2013).

Plaintiff filed his Complaint on September 29, 2014, which asserts the following claims: (i) Count One – age discrimination in violation of the ADEA; and (ii) Count Two – age discrimination in violation of the NJLAD.  On July 11, 2016, Defendant filed the instant motion for summary judgment.

## II.    STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A factual dispute is genuine only if there is "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party," and it is material only if it has the ability to "affect the outcome of the suit under governing law."  Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment. Anderson, 477 U.S. at 248.  "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'"  Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004) (quoting Anderson, 477 U.S. at 255); see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Curley v. Klem, 298 F.3d 271, 276-77 (3d Cir. 2002).

The party moving for summary judgment has the initial burden of showing the basis for its motion.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "If the moving party will bear the burden of persuasion at trial, that party must support its motion with credible evidence . . . that would entitle it to a directed verdict if not controverted at trial."  Id. at 331.  On the other hand, if

the burden of persuasion at trial would be on the nonmoving party, the party moving for summary judgment may satisfy Rule 56's burden of production by either (1) "submit[ting] affirmative evidence that negates an essential element of the nonmoving party's claim" or (2) demonstrating "that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." Id. Once the movant adequately supports its motion pursuant to Rule 56(c), the burden shifts to the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Id. at 324; see also Matsushita, 475 U.S. at 586; Ridgewood Bd. of Ed. v. Stokley, 172 F.3d 238, 252 (3d Cir. 1999). In deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. Anderson, 477 U.S. at 249. Credibility determinations are the province of the factfinder. Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

There can be "no genuine issue as to any material fact," however, if a party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322-23. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. at 323; Katz v. Aetna Cas. & Sur. Co., 972 F.2d 53, 55 (3d Cir. 1992).

## III   DISCUSSION

### A.   Age discrimination under the ADEA and NJLAD

"The ADEA prohibits employers from discriminating against individuals in hiring, discharge, compensation, term, conditions, or privileges on the basis of their age." Duffy v. Paper

Magic Group, Inc., 265 F.3d 163, 167 (3d Cir. 2001); see 29 U.S.C. § 623(a).  The purpose of the ADEA is to "promote employment of older persons based on their ability rather than age; to prohibit arbitrary discrimination in employment; [and] to help employers and workers find ways of meeting problems arising from the impact of age on employment."  29 U.S.C. § 621(b); see Hildebrand v. Allegheny County, 757 F.3d 99, 109 (3d Cir. 2014).  Likewise, the NJLAD makes age discrimination unlawful in refusing to hire an applicant.  See N.J.S.A. § 10:10:5-12(a) (stating that it is unlawful "[f]or an employer, because of the… age… of any individual… to refuse to hire or employ or to bar or to discharge or require to require…."); see Warner v. Fed. Express Corp., 174 F. Supp. 2d 215, 219 (D.N.J. 2001).  Because of their similarities, "[a]ge discrimination claims under the ADEA and LAD are governed by the same standards and allocation of burden of proofs," Lawrence v. Nat'l Westminster Bank, 98 F.3d 61, 65 (3d Cir. 1996), and as such, this Court will consider those claims together.

To succeed on a claim for age discrimination under the ADEA and NJLAD, the plaintiff bears the ultimate burden of establishing that his or her "age actually… played a role in the employer's decisionmaking process and had a determinative influence on the outcome of that process."  Monaco v. Am. Gen. Assur. Co., 359 F.3d 296, 300 (3d Cir. 2004); see Kamenov v. Highwood USA, 531 Fed. App'x 253, 254-255 (3d Cir. 2013) ("To succeed on an ADEA claim, a Claimant must show that his or her age actually motivated and had a determinative influence on the employer's decision to fire him or her").  Stated differently, the plaintiff must prove that he or she would not have suffered an adverse employment decision but for his or her age.  Geltzer v. Virtua W. Jersey Health Sys., 804 F. Supp. 2d 241, 248 (D.N.J. 2011) ("As stated before, Geltzer must prove that but for his age, Virtua's decisions would have been different.").

To establish a *prima facie* case of age discrimination, a plaintiff must show that: (1) he is a member of a protected class, i.e., he is forty years of age or older;[6]  (2) he suffered an adverse employment action; (3) he was qualified for the position in question; and (4) he was ultimately replaced by another employee who was sufficiently younger to support an inference of discriminatory animus.  Monaco, 359 F.3d at 300-301; see McClement v. Port Auth. Trans-Hudson, 505 Fed. App'x 158, 162-163 (3d Cir. 2012); see also Duffy, 265 F.3d at 167 ("Age discrimination may be established by direct or indirect evidence.").

Under the burden-shifting framework, if the plaintiff establishes a *prima facie* case, the burden then shifts to the employer "to articulate some legitimate, nondiscriminatory reason for the employee's rejection."  McDonnell Douglas Corp. v. Green, 441 U.S. 792, 802 (1973); see Willis v. UPMC Children's Hosp. of Pittsburgh, 808 F.3d 638, 644 (3d Cir. 2015) ("Age discrimination claims in which the plaintiff relies on circumstantial evidence proceed according to a three-part burden-shifting framework set forth in [McDonnell Douglas]."); see also Bentley v. Millennium Healthcare Cntrs. II, 363 Fed. App'x 891, 894 (3d Cir. 2010) (stating that the McDonnell Douglas burden shifting standard "applies to plaintiff's claims under both the ADEA and the NJLAD."). "Once the employer answers its relatively light burden by articulating a legitimate reason for the unfavorable employment decision, the burden of production rebounds to the plaintiff, who must now show by a preponderance of the evidence that the employer's explanation is pretextual (thus meeting the plaintiff's burden of persuasion)."  Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994).

**B.**    ***Prima Facie* Case**

---

[6] The NJLAD does not establish an age limitation on who is able to assert an age discrimination claim.  See Wright v. L-3 Communications Corp., 227 F. Supp. 2d 293, 298 (D.N.J. 2002) ("Unlike federal discrimination claims brought under the ADEA, the first LAD element for a *prima facie* case of age discrimination is not limited to employees age forty or older.").

Defendant argues that Plaintiff cannot establish a *prima facie* case of age discrimination under either the ADEA or NJLAD, because Plaintiff was not replaced by another employee who was sufficiently younger to support an inference of discriminatory animus. Defendant contends that Plaintiff was ultimately replaced by Curry, who was also in his seventies when Defendant made the decision not to rehire Plaintiff. Furthermore, Defendant maintains that Kraft, who held the position of Locker Room Manager for less than one day, did not ultimately replace Plaintiff. Rather, Kraft asked to be placed in that position until the position of Caddy Master opened up.[7]

In opposition, Plaintiff contends that Defendant intended to replace him with Kraft, who was in his fifties when he became Locker Room Manager, but Defendant decided to move Curry into that position after Plaintiff sent a letter suggesting litigation. Plaintiff maintains that "it can be fairly assumed that the defendant realizing that Mr. Bals was threatening the possibility of a lawsuit moved to try to remedy a vulnerability in its plan" to discriminate against Plaintiff based on his age. Pl.'s Br. in Opp. at pg. 5. In addition, "Plaintiff submits that the significantly younger standard varies upon the relative ages of the offended plaintiff and the replacement." Id. at 6. Plaintiff reasons that "a difference of 5 years may be insignificant to a plaintiff who is 45, 55 or even 65, the average age of retirement. But a difference of 5 years, is of a great significance to a person who is 79 years old." Id.

---

[7] Defendant does not argue that Plaintiff fails to satisfy the first three elements of test. See Def.'s Br. at pg. 6 ("While Plaintiff can likely satisfy the first three elements of the *prima facie* case, he is unable to satisfy the fourth element that requires Plaintiff to present evidence that raises an inference of age discrimination."). For the sake of completeness, however, I shall briefly address those three elements. See Monaco, 359 F.3d at 300-301. Here, Plaintiff was well over the age of forty when Defendant decided not to rehire Plaintiff. In addition, there is no evidence to suggest that he was not qualified for the job of Locker Room Manager. Indeed, Defendant employed Plaintiff for four seasons in that position. Finally, Plaintiff suffered an adverse employment action, i.e., he was not rehired for the 2013 season at Trump National.

In the Third Circuit, "[t]here is no magical formula to measure a particular age gap and determine if it is sufficiently wide to give rise to an inference of discrimination." Barber v. CSX Distrib. Servs., 68 F.3d 694, 699 (3d Cir. 1995); see Sempier v. Johnson & Higgins, 45 F.3d 724, 729 (3d Cir. 1995) (stating that there is no "particular age difference that must be shown."); see also Showalter v. Univ. of Pittsburgh Med. Ctr., 190 F.3d 231, 236 (3d Cir. 1999).  With that said, the Third Circuit generally requires at least a five year age difference between the plaintiff and his or her replacement, and an eight year age gap is certainly sufficient to permit an inference of discrimination.  See Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1119 (3d Cir. 1997) (holding that "the approximate five year age difference… is sufficient to establish an inference that Keller's age was a motivating factor in Credit Alliance's decision."); Sheridan v. E.I. Dupont de Nemours & Co., 100 F.3d 1061, 1084 (3d Cir. 1996) ("With respect to the final element of this formulation, we have held that an eight-year gap is enough and have suggested that a five-year difference may suffice."); Barber, 68 F.3d at 699 (holding that "the eight year difference between Barber and the successful candidate, Kathy Ball, could support a finding that Ball was 'sufficiently younger' than Barber to permit an inference of age discrimination.").  On the other hand, a one year age difference is clearly insufficient, but an age gap of less than five years, but more than one year, remains an open question.  See Monaco, 359 F.3d at 307 (stating that "in order to satisfy the sufficiently younger standard, there is no particular age difference that must be shown, but while different courts have held… that a five year difference can be sufficient,… a one year difference cannot.") (quoting Showalter, 190 F.3d at 236).

In the instant matter, Plaintiff contends that Kraft, who was significantly younger, replaced Plaintiff as the Locker Room Manager.  Plaintiff further contends that Defendant was prompted to remove Kraft from that position because he sent Brzyski a letter suggesting litigation.  According

to Plaintiff, Kraft being named Locker Room Manager, and then being quickly removed from that position, allegedly when Defendant received Plaintiff's letter, demonstrate Defendant's intention to replace Plaintiff with someone younger and then acting to cover it up.  Plaintiff's argument is misplaced.  Initially, Plaintiff's position was given to Kraft.  Ursino Dep. at 99:17-23; Kraft Dep. at 11:21-23; Bals Dep. at 186:18-20.  However, Kraft did not replace Plaintiff, but rather, Kraft temporarily filled that position.  Kraft Dep. at 15:9-16, 19:18-21; Ursino Dep. at 99:17-23, 101:5-16.  Tellingly, in his deposition, Plaintiff acknowledged that Kraft accepted the position of Locker Room Manager with the intention of moving to Caddy Master.  Bals Dep. at 98:7-16 ("What happened was, Michael Kraft was going to take my place.  The very day that the club opened, [the former Caddy Master] quits, so Mike Kraft moved out to be caddy master, which is a job he always wanted.").  While it is undisputed that Kraft was in his fifties, which is undoubtedly sufficiently younger to permit an inference of age discrimination, Kraft only held the position for approximately two hours, i.e., less than one day.  Kraft Dep. at 16:20-23.  Indeed, Plaintiff testified that Kraft only held the position "overnight."  Bals Dep. at 98:17-99:4.  Accordingly, Plaintiff was not ultimately replaced by Kraft.  See Monaco, 359 F.3d at 300-301.

Rather, Curry ultimately replaced Plaintiff as the Locker Room Manager.  Bals Dep. at 98:17-99:4 (stating that Kraft was only the Locker Room Manager "[o]vernight," and that Curry "is still there, so it's a permanent position, I would assume.").  While it is undisputed that Plaintiff was 79 years old when he was not rehired, see Bals Dep. at 75:11-13, Plaintiff attempts to create a dispute over Curry's age when Curry became the Locker Room Manager.  For instance, in his opposition brief, Plaintiff repeatedly states that Curry's age is "unknown."  However, the evidence clearly supports the fact that Curry was 72 years old when he replaced Plaintiff.

16

In his responses to written discovery, dated December 23, 2015, Plaintiff plainly states: "Plaintiff 81 years old was terminated without cause and replaced by a 74 year old."  Pl.'s Responses to Interrogatories Nos. 17, 18, 19.  It is undisputed that Plaintiff was 79 in 2013, when he was not rehired, and 81 years old in 2015, when he responded to discovery requests in connection with the pending lawsuit.  According to Defendant's responses to written discovery, dated May 8, 2015, "Mr. Curry is now approximately 74" in 2015.  Def.'s Response to Interrogatory No. 19.  According to Defendant, Curry was born on January 29, 1941, and therefore, he was 72 years old in March 2013 when Curry was assigned to Plaintiff's position.  Def.'s Response to Interrogatory No. 9.  Thus, there was a seven year age difference between Curry and Plaintiff at the time Curry became the Locker Room Manager, which is sufficient to permit an inference of age discrimination.  See Keller, 130 F.3d at 1119; Sheridan, 100 F.3d at 1084; Monaco, 359 F.3d at 307.

Because Plaintiff has established a *prima facie* case of age discrimination under the ADEA and NJLAD, which "creates an inference of unlawful discrimination," see Willis, 808 F.3d at 644, the Court must move onto the next step in the McDonnell Douglas burden shifting analysis.

## C.   Articulated Legitimate, Nondiscriminatory Reason

Once a plaintiff establishes a *prima facie* case of age discrimination, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment decision.  McDonnell Douglas Corp., 441 U.S. at 802.  "The employer satisfies its burden of production by introducing evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision."  Fuentes, 32 F.3d at 763.  However, "[t]he employer need not prove that the tendered reason *actually* motivated its behavior, as throughout this burden-shifting paradigm the ultimate burden of proving intentional

discrimination always rests with the plaintiff." Id.; see Willis, 808 F.3d at 644 ("This second step of McDonnell Douglas does not require that the employer prove that the articulated legitimate, nondiscriminatory reason was the actual reason for the adverse employment action. Instead, the employer must provide evidence that will allow the factfinder to determine that the decision was made for nondiscriminatory reasons.").

Here, Brzyski and Ursino testified that they jointly made the decision not to rehire Plaintiff for the 2013 season. Brzyski Dep. at 50:1-9. However, Ursino stated that Brzyski, the General Manager at the time, had "the final call." Ursino Dep. at 141:17. In reaching her decision, Brzyski testified that Plaintiff was not rehired because of his: (i) poor performance; (ii) poor attitude; and (iii) inability to be a team player. See Brzyski Dep. at 51:20-52:1. Brzyski added that her primary concern was Plaintiff's poor "interaction with the co-workers. You know, you have to have a cohesive staff in order to run a successful business." Id. at 101:6-11. Ursino further explained that Plaintiff was confrontational with other employees, and that he frequently defied direct requests from supervisors, including Ursino. In particular, Ursino explained that he requested that Plaintiff put nameplates on the lockers for an upcoming golfing event. Ursino Dep. at 49:13-50:4. However, Ursino testified that Plaintiff refused to put the nameplates on the lockers, since the players at the golf outing were "trunk slammers" – people that typically play golf at public courses. Id. Ursino later testified that he did not appreciate the tone with which Plaintiff "spoke to me in front of a member." 71:24-72:1. He also stated, "instead of communicating to me what it was he was feeling, he basically started yelling and raising his voice and talking down to me. And, you know, I asked him afterwards to, if we could have conversations without members present that would be more professional." Id. at 72:19-24.

Furthermore, Ursino testified that Plaintiff "was selective about who he gave members – gave locks to and who he didn't give lockers to." Id. at 62:18-20.  Indeed, Ursino testified that Plaintiff gave some members and guests preferential treatment based on their likelihood to tip well, which was a constant source of friction between them. Id. at 62:22-63:3.  Ursino explained that they frequently "had a disagreement on the fact that I believed every person coming to the club, whether they were a member or guest, should get the same service," but Plaintiff "would tell me that, he would tell me flat out that he wasn't giving lockers to people that he felt were trunk slammers or weren't going to tip him."[8] Id. at 71:13-20.

Finally, even Plaintiff acknowledges that Ursino told Plaintiff that he was not being rehired because he failed to get along with other employees at Trump National.  Specifically, Plaintiff stated: "I was called on the phone by Anthony Ursino…. He said, we're not taking you back this year.  I said, Anthony, why? And I guess he startled me, and he says, because you don't get along with people."  Bals Dep. at 169:1-7.  In response to that conversation, Plaintiff testified that he "was disappointed, greatly disappointed because when you -- nobody ever said I did anything wrong.  I'll say this honestly.  I'd challenge anybody.  Get one member or one guest or a member's kid.  I got along with everybody wonderful.  I challenge anybody." Id. at 185:6-11.

Here, there is sufficient evidence for a reasonable factfinder to conclude that Defendant has articulated legitimate, nondiscriminatory reasons for not rehiring Plaintiff for the 2013 season. See Willis, 808 F.3d at 644.  According to Defendant, some of those reasons include Plaintiff: (i) failing to follow directions, as well as being abrasive and confrontational when supervisors asked

---

[8] Although not relevant at this step of the burden shifting analysis, I note that Plaintiff specifically denies engaging in such behaviors, but he did state that it would be inappropriate for an employee to alter the manner in which he or she treats a member or a guest based on their tipping practices. Bals Dep. at 191:12-18.

him to perform various job responsibilities; (ii) making disrespectful comments about guests, including calling those individuals "trunk slammers;" (iii) treating guests differently depending on whether he believed that member or guest would give him a good tip; and (iv) maintaining poor relationships with his fellow employees. Based on those reasons, the burden shifts back to Plaintiff to show, by a preponderance of the evidence, that Defendant's explanation is pretextual. See Fuentes, 32 F.3d at 763; Willis, 808 F.3d at 644.

**D.      Pretext**

Once the burden shifts back to the plaintiff, there are two ways in which the plaintiff can demonstrate that his or her employer's articulated reason is pretextual. See Fuentes, 32 F.3d at 762; Willis, 808 F.3d at 644; see also Bowles v. City of Camden, 993 F. Supp. 255, 262 (D.N.J. 1998) ("Pretext is a purpose or motive alleged or an appearance assumed in order to cloak the real intention or state of affairs; in essence, pretext is a cover-up for a discriminatory purpose.") (internal quotation marks and citation omitted). First, the plaintiff may "point to evidence that would allow a factfinder to disbelieve the employer's reason for the adverse employment action." Willis, 808 F.3d at 644 (citing Fuentes, 32 F.3d at 765). "In order to raise sufficient disbelief, the evidence must indicate 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons' to satisfy the factfinder that the employer's actions could not have been for nondiscriminatory reasons." Id. at 644-645 (quoting Fuentes, 32 F.3d at 765). Second, the plaintiff may "point to evidence that would allow a factfinder to believe that an invidious discriminatory reason was 'more likely than not a motivating or determinative cause' of the employer's action." Id. at 645 (quoting Fuentes, 32 F.3d at 764). In particular, the plaintiff can point to the following types of evidence: "(1) the defendant previously discriminated against the plaintiff; (2) the defendant discriminated against others within the

plaintiff's protected class; or (3) the defendant has treated similarly situated, substantially younger individuals more favorably."  Willis, 808 F.3d at 645.

1. **First Method of Proving Pretext – Examining the Proffered Reasons for the Adverse Employment Action**

Defendant argues that the evidence fully supports its reason for terminating Plaintiff, and that Plaintiff has failed to present evidence that indicates that its legitimate reason for not rehiring Plaintiff was pretextual.  Indeed, Defendant maintains that its explanation for its decision has been consistent from the outset.  Defendant submits that it is entitled to make changes in personnel to ensure the best people for the job are hired for each position in order to provide a level of service to Trump National members and guests that is consistent with what is expected.  Defendant avers that Plaintiff was simply unhappy with its nondiscriminatory business decision, which is insufficient to establish pretext.

In response, Plaintiff contends that he "has dismantled and demolished each of the alleged non-discriminatory reasons advanced by the defendants [sic] through their attorneys."  Pl.'s Br. in Opp. at pg. 7.  Specifically, Plaintiff contends that Ursino was unable to set forth specific instances in which Plaintiff had engaged in poor performance, nor could Ursino offer specific details about Plaintiff's purported preferential treatment to guests based on tipping practices.  Plaintiff also asserts that, other than reading his personnel file, Brzyski had no personal knowledge of Plaintiff treating any members, guests or other employees in an inappropriate manner.  In addition, Plaintiff contends that he has denied all allegations of poor performance, and that he was never disciplined by management for those reasons, nor did his supervisors address any performance issues with him.  In sum, Plaintiff argues that "[i]t is readily apparent what happened in this case.  Mr. Bals, at age 79, was seen by Mr. Ursino as too old."  Pl.'s Br. in Opp. at 9.

The Third Circuit has explained that a "plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." Keller, 130 F.3d at 1108 (quoting Fuentes, 32 F.3d at 765).  Indeed, courts "are not a super-personnel department tasked with correcting unduly harsh employment actions; we are instead concerned with whether the reasons for such actions are pretextual." See Klimek v. United Steelworkers Local 397, 618 Fed. App'x 77, 80 (3d Cir. 2015) (internal quotation marks and citation omitted); see also Keller, 130 F.3d at 1109 (stating that the relevant inquiry is not whether the employer made the best, or even a sound, business decision, but rather, whether the real reason for the adverse employment action is discrimination).  As a result, the plaintiff "must show, not merely that the employer's proffered reason was wrong, but that it was so plainly wrong that it cannot have been the employer's real reason," see Keller, 130 F.3d at 1109, which Plaintiff has failed to do.

In the instant matter, Plaintiff first argues that Defendant's proffered reasons are pretextual because he denies all allegations of poor performance.  In order to demonstrate that the employer's proffered reasons are so plainly wrong, however, a plaintiff cannot use conclusory denials of his or her own inappropriate conduct to create a genuine issue of material fact.   See Slater v. Susquehanna Cnty., 465 Fed. App'x 132, 137 (3d Cir. 2012) (holding that, because the plaintiff simply endeavored to cast doubt upon the justifications for her discharge by denying her own inappropriate conduct, "[a] reasonable jury could not conclude, from Slater's testimony alone, that the defendants' legitimate reasons were implausible, inconsistent, incoherent, contradictory, or otherwise a pretext for discharging her because of her age."); Ade v. KidsPeace Corp., 401 Fed. App'x 697, 703 (3d Cir. 2010) (stating that, under the McDonnell Douglas framework, "[a] denial

that [the plaintiff] engaged in the conduct for which he was purportedly terminated is insufficient to create a genuine issue of material fact."); see also Jorrin v. Lidestri Foods, Inc., No. 11-2064, 2013 U.S. Dist. LEXIS 44475, at *44-45 (D.N.J. Mar. 28, 2013) ("These conclusory, self-serving denials [of the plaintiff's inappropriate conduct] are insufficient to demonstrate that [defendant's] legitimate, non-retaliatory reason was a pretext."). Without additional facts, or plausible inferences properly drawn therefrom, Plaintiff's own self-serving denials cannot properly be used to rebut or discredit Defendant's proffered nondiscriminatory explanation for not rehiring Plaintiff. See Slater, 465 Fed. App'x at 137; Ade, 401 Fed. App'x at 703. Indeed, Ursino and Brzyski have provided a significant amount of testimony that Plaintiff engaged in the behaviors for which he was purportedly terminated. See Slater, 465 Fed. App'x at 137 (concluding that the plaintiff failed to surmount the difficult burden of proving pretext because, "[i]n light of profuse testimony by her coworkers and supervisors that [the plaintiff] did, in fact, permit an armed trooper to enter the prison and improperly dispose of used medical gloves.").

Furthermore, one of the proffered reasons, that Plaintiff did not get along with his co-workers, was essentially conceded by Plaintiff in his deposition testimony. When asked whether he had any disagreements or disputes with other co-workers, Plaintiff responded, "No…. They had [disagreements or disputes] with me, maybe, but I certainly – I thought everybody was fine. I enjoyed working with everyone." Bals Dep. at 101:4-10. Plaintiff also acknowledged that he and Ursino had a "dispute [] over me not getting the contracts of the new members," which required Plaintiff to fill out fax sheets. Id. at 101:12-102:10. Plaintiff testified, "I confronted [Ursino] why I did not get the fax sheets on the members, and this was probably, between [Ursino] and Brian Bauer, the 15th or 20th time I had mentioned that I needed them…." Id. at 101:16-23. Plaintiff continued, "And, [Ursino] said to me, you've been getting them. I said, Anthony, don't lie to me,

I haven't got one, and I was mad, and I told him, I said, don't stand there and lie to me. I won't accept it…." Id. at 101:23-102:2. Nevertheless, Plaintiff testified that he later in the day apologized to Ursino: "I said to him, Anthony, if I upset you, I'm sorry about that. I apologized, but I said, I'm sorry, but you're wrong and I need [the fax sheets]." Id. at 102:2-5. Even though Plaintiff chose to apologize to Ursino, Plaintiff nonetheless testified that all of the criticism leveled against him could be dismissed because "[n]obody cared." Id. at 102:5-10. No one cared about the fax sheets, and "nobody cared about the coffee [creamer]…. Nobody cared about the towels, nobody cared about the key. It was just unbelievable." Id. Therefore, while Plaintiff has essentially conceded that there was tension or unease with his co-workers, he attributes those disagreements to his co-workers' lack of dedication to the job. But whatever was the underlying basis for the dissension, it does not change the fact that there were disagreements between Plaintiff and his co-workers.

Second, Plaintiff contends that Ursino could not set forth specific instances of poor performance; this is incorrect. For instance, Ursino testified that Plaintiff refused to put nameplates on the lockers in anticipation of a golf outing with numerous guests, because Plaintiff considered those guests to be "trunk slammers." Ursino Dep. at 49:13-50:4. In connection with that incident, Ursino testified that Plaintiff "basically started yelling and raising his voice and talking down to me." Id. at 72:19-24. Tellingly, in connection with this motion, Plaintiff did not present any evidence to contradict Ursino's testimony in connection with this incident. To be clear, Plaintiff never testified, for example, that: (i) Ursino did not ask him to put nameplates on the lockers; or (ii) Plaintiff actually placed the nameplates on the lockers; or that (iii) he did not raise his voice with Ursino with respect to this incident. Rather, Plaintiff was silent on this particular incident. Thus, contrary to Plaintiff's position, Ursino testified to at least one specific

instance of Plaintiff's poor performance, which remains unrefuted.  See Cinelli v. U.S. Energy Partners, 77 F. Supp. 2d 566, 578 (D.N.J. 1999) ("A defendant is entitled to summary judgment at this stage if the plaintiff has not produced sufficient evidence to rebut the defendant's proffered nondiscriminatory explanation for the discharge.").

Third, Plaintiff argues that Ursino failed to present specific details with respect to Plaintiff giving some members or guests preferential treatment.  The record is to the contrary.  See Ursino Dep. at 62:18-63:3.  Ursino specifically testified that "if the guest was a guest of a member that he felt was going to tip him he would give them the locker."  Id. at 62:22-63:3.  However, "if it was a guest of a member that he didn't feel was going to tip him he wouldn't give them a locker and he would frankly pay no attention to them."  Id.  Ursino explained that he and Plaintiff frequently "had a disagreement on the fact that [Ursino] believed every person coming to the club, whether they were a member or guest, should get the same service," but Plaintiff "would tell [Ursino] flat out that he wasn't giving lockers to people that he felt were trunk slammers or weren't going to tip him."  Id. at 71:13-20.  Indeed, according to Brzyski, Plaintiff's personnel file noted that he treated some members and guests differently "because [they were] not tipping [Plaintiff] as well as certain members are being – are tipping him."  See Brzyski Dep. at 78:6-21.  While Plaintiff testified that he did not engage in such behavior, see Bals Dep. at 191:12-18, there is also no testimony that he did not use the term "truck slammer" or other such language denigrating members and/or guests.  Furthermore, Plaintiff conceded that it would be inappropriate for an employee to alter the manner in which he or she treats a member or a guest based on their tipping practices.  Bals Dep. at 191:12-18.  Nevertheless, Plaintiff's bald denial that he did not engage in this behavior is insufficient to create a genuine issue of material fact.  See Slater, 465 Fed. App'x at 137; Ade, 401 Fed. App'x at 703.

Fourth, Plaintiff maintains that he was never disciplined by a supervisor, nor did his supervisors ever address any performance issues with him.  By Plaintiff's own admission, the later assertion is without merit.  In regard to the creamer incident in 2011, Plaintiff meet with Roberts, the former General Manager, Gleason and Bauer.  Bals Dep. at 37:18-40:2.  At the meeting, Plaintiff admits that those individual had pictures of the creamers, "which I saw for the first time with signs I put on it, and it's like, you're wrong.  I wasn't wrong.  I called to the attention that something was wrong with their services."  Id. at 37:20-24.  Plaintiff was clearly reprimanded at that meeting, since Plaintiff was told that he was wrong for putting up those signs on the creamers.  Id.  In addition, Plaintiff admitted that Bauer, his former supervisor, was critical of his performance "one time" because Plaintiff "didn't leave enough lockers open, but of course [Bauer] didn't know the reason why."[9]  Id. at 94:8-13.  Plaintiff also admitted that Ursino was critical of his performance.  Id. at 94:14-25.

Finally, Plaintiff contends that Brzyski did not have personal knowledge of Plaintiff mistreating members or guests.  I note that Plaintiff has offered no authority to support his position that a general manager or supervisor must have firsthand knowledge of an employee's poor performance.  Indeed, the Third Circuit has concluded that a supervisor's lack of personal knowledge about the employee's job performance is immaterial.  See Smith v. City of Allentown, 589 F.3d 684, 692 (3d Cir. 2009) ("Dougherty's lack of personal knowledge about Smith's job performance is likewise immaterial.  It is undisputed that Dougherty perused Smith's personnel file," as well as discussed Smith's performance with other individuals, which is sufficient to form a decision).  With respect to her decision making process, Brzyski testified that she relied on

---

[9] However, it is unclear from Plaintiff's deposition testimony when Bauer was critical of his performance.

Plaintiff's personnel file, which included information about Plaintiff not treating some members and guests the same, see Brzyski Dep. at 50:1-9, 78:6-21, and she also had discussions with Ursino, who did have firsthand knowledge of Plaintiff's job performance.   See id. at 50:1-9.   In fact, Plaintiff has conceded that his personnel file noted specific instances of performance-related criticisms.   See Bals Dep. at 141:15-142:13, 153:10-155:3; see also Pl.'s Counterstatement of Facts, ¶ 20 ("The documentation contained in Mr. Bals' personnel file deals with the issues discussed above, ie., the coffee station incident and the towel inventory incident[.]").

Because Plaintiff has failed to present sufficient direct or circumstantial evidence to rebut Defendant's business reasons for not rehiring Plaintiff, a reasonable jury could not conclude that Defendant's proffered reasons are weak, implausible, inconsistent, incoherent, contradictory or otherwise a pretext for failing to rehire Plaintiff for the 2013 season.   See Willis, 808 F.3d at 644-645; Keller, 130 F.3d at 1109.   Aside from his own conclusory and self-serving denials, Plaintiff has failed to present any evidence that could plausibly show that Defendant's decision not to rehire Plaintiff was motivated by discriminatory animus based on his age.   See Fasold v. Justice, 409 F.3d 178, 185 (3d Cir. 2005); see also Slater, 465 Fed. App'x at 137 (dismissing the plaintiff's ADEA claim because, inter alia, "[s]he introduced no evidence that she was fired because of her age."); Vasbinder v. Sec. Dep't of Veteran Affairs, 487 Fed. App'x 746, 750 (3d Cir. 2012) (stating that a plaintiff "must show that discriminatory animus motivated the adverse employment action, not that [the adverse employment action] was merely 'wrong or mistaken.'") (quoting Fuentes, 32 F.3d at 765).

In addition, although Plaintiff contends that it is clear that he was not rehired because of his age, his subjective belief that Defendant's decision was discriminatory is insufficient to show pretext.   Jones v. Sch. Dist. of Phila., 198 F.3d 403, 414 (3d Cir. 1999) (concluding that a plaintiff's

personal belief, without factual support, is insufficient to show a pretext for discrimination); see Ekhato v. Rite Aid Corp., 529 Fed. App'x 152, 156 (3d Cir. 2013) ("Ekhato's subjective belief that the decision to terminate her employment was discriminatory is insufficient."); Ade, 401 Fed. App'x at 703 ("His own personal belief that the true reason for the discharge was racial discrimination is similarly insufficient to create a genuine issue of material fact."). Finally, at his deposition, Plaintiff, rather than identifying an animus based upon age, testified instead that he believed that both Brzyski and Ursino displayed a lack of maturity and management experience in performing their job responsibilities. Bals Dep. at 174:20-175:15. That sentiment is consistent with the letter that Plaintiff sent to Brzyski shortly after he was not rehired. In that letter, Plaintiff stated that his supervisors' behavior "is consistent with a lack of maturity and management experience, for failure to realize that people under you can be your greatest asset." Pl.'s Letter to Brzyski at pg. 1. In order to prove pretext, however, Plaintiff must do more than challenge the acumen of his supervisors. See Keller, 130 F.3d at 1108. He must "point to evidence that would allow a factfinder to disbelieve the employer's reason for the adverse employment action," see Willis, 808 F.3d at 644, which he has failed to do. Accordingly, Plaintiff has failed to satisfy the first method for proving pretext.

**2.      Second Method of Proving Pretext – Does the Evidence Show a Discriminatory Animus**

Defendant contends that Plaintiff has presented no evidence that Defendant previously discriminated against him based on his age. Plaintiff was hired by Defendant in 2008 when he was 74 years old and was rehired for the next four seasons, and he received raises each year. With respect to Ursino calling Plaintiff an "old man," Defendant avers that these isolated comments are insufficient to establish that Plaintiff's age was the real reason Defendant decided not to rehire

Plaintiff, nor has Plaintiff offered evidence to suggest that these alleged comments bore any relation or temporal proximity to the decision not to rehire Plaintiff.[10]

Plaintiff argues that Defendant, through its employees, previously discriminated against Plaintiff. Specifically, Plaintiff contends that Ursino would call him an "old man" and asked if Plaintiff could make it up the stairs to the second floor of the building.  In addition, Plaintiff maintains that Gleason also made discriminatory remarks directed at him.  Plaintiff explained that Gleason questioned his mental acuity when he ordered eye drops for the locker room, as well as his desire to count all of the towels. Based on these instances of discrimination, Plaintiff contends that the real reason for the decision not to rehire him was his age.

The Third Circuit has held that a decisionmaker's ageist comment is insufficient to show that the employer acted with discriminatory animus in the decision making process when that comment is temporally remote from the adverse employment action.  See Keller, 130 F.3d at 1112 (holding that the decisionmaker's age-related comment "alone could not reasonably be viewed as sufficient to prove by a preponderance of the evidence that age was a determinative cause of [the plaintiff's] subsequent termination," especially since "the alleged comment occurred four or five months prior to the time when [the decisionmaker] decided that [the plaintiff] should be discharged."); see also Ade, 401 Fed. App'x at 704 ("Doran was Ade's supervisor and involved in the decision-making process to terminate Ade, but her [racially discriminatory] comment and

---

[10] In addition, Defendant argues that Plaintiff has not presented any evidence that Defendant has previously discriminated against other individuals over the age of 40, nor has Plaintiff provided even a scintilla of evidence of similarly situated, substantially younger employees committing the same infractions as Plaintiff and escaping discipline.  See Willis, 808 F.3d at 645.  However, Plaintiff does not address these arguments in his opposition brief, and with good reason – Plaintiff has failed to point to those types of evidence in the record.

question relating to a piece of food, made approximately six months before Ade's termination, are insufficient to show that a discriminatory animus was the likely cause of the adverse action.") (citing <u>Keller</u>, 130 F.3d at 1112).  Here, while Plaintiff contends that Ursino called him an "old man" on several occasions, Plaintiff only provides one example, which appears to have occurred on October 21, 2011:

> BALS:  I asked [Ursino] something. He came in to me and he said, listen, old man, can you spare a guy for a few minutes? I says, I don't know. I'll probably fall down and hurt myself, but sure.
>
> COUSNEL:  So he was joking around?
>
> BALS:  Yeah.
>
> COUSNEL:  All right. Would you take a look at -- did you and Mr. Ursino joke around April back and forth?
>
> BALS:  I don't know if he joked, but I joked a lot. I thought he was joking, too, but obviously, he wasn't.

<u>Id.</u> at 152:21-154:13.  Clearly, Plaintiff suggested that Ursino was joking when he made that comment in October 2011.  Even assuming Ursino was not joking, that comment is insufficient to show that age was a determinative factor in the decision not to rehire Plaintiff in March 2013, since Ursino called Plaintiff an "old man" approximately one and a half years before Brzyski, in consultation with Ursino, made that adverse employment decision.  <u>See</u> <u>Keller</u>, 130 F.3d at 1112. In addition, Plaintiff further testified that Ursino asked: "Can you get upstairs all right today?" Bals Dep. at 28:9-11.  However, it is unclear when that comment was made, so the Court is unable to determine, at this stage, whether that remark affected the decision not to rehire Plaintiff.  But, more importantly, Plaintiff has failed to testify or present any evidence to place that comment in context.  Without additional facts and circumstances, a reasonable jury could not conclude that simply asking someone if they can get up the stairs bespeaks age discrimination.

Moreover, when asked whether someone else made discriminatory remarks about his age, Plaintiff stated that Gleason commented on Plaintiff purchasing eye drops for the locker room.

Specifically, Plaintiff argues that Gleason questioned his mental acuity one day when she said, "He doesn't know what he's doing." That statement, on its face, has nothing to do with age. Rather, that statement questions whether Plaintiff is qualified to do his job. Even if that statement was age-related, Gleason is not a decisionmaker, and as such, it would have been nothing more than a stray remark, which is alone insufficient to support a claim of age discrimination. See Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 545 (3d Cir. 1992) ("Stray remarks by non-decisionmakers or by decisionmakers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of decision."); see also Ewell v. NBA Properties, Inc., 94 F. Supp. 3d 612, 624 (D.N.J. 2015) ("Isolated remarks unrelated to employment decisions, without more, do not make discrimination cases."). Accordingly, Plaintiff has failed to satisfy the second method of proving pretext.[11] Without showing pretext, Plaintiff's ADEA and NJLAD claims cannot withstand summary judgment.

## IV.   CONCLUSION

For the reasons set forth above, Defendant's motion for summary judgment on Plaintiff's claims under the ADEA and NJLAD is **GRANTED**.

---

[11] To the extent that Plaintiff argues that his "settlement" letter to Brzyski is evidence of pretext, that argument must fail. Plaintiff contends that, after he sent that letter, Defendant abruptly replaced Kraft, who was in his fifties, with Curry, who was in his seventies at the time Curry was assigned to the position of Locker Room Manager. Based on temporal proximity of those two events, Plaintiff appears to argue that Defendant acted with discriminatory animus based on age. As discussed supra, however, Plaintiff conceded that Kraft did not intend to stay as the Locker Room Manager, since Kraft wanted to be Caddy Master. Bals Dep. at 98:7-16. More importantly, in his letter, Plaintiff does not state, or even suggest, that age played a role in Defendant's decision. Pl.'s Letter to Brzyski at pgs. 1-2. Rather, Plaintiff specifically attributes Defendant's decision not to rehire him to "a lack of maturity and management experience" on the part of Brzyski and Ursino. Id. at pg. 1. Accordingly, no reasonable jury could find that the letter was evidence of pretext.

Date: December 16, 2016

/s/ Freda L. Wolfson
The Honorable Freda L. Wolfson
United States District Judge